# In The Matter Of:

*LEWIS LAKE vs.*

*HAYT, HAYT & LANDAU, et al.*

---

*ROBERT J. OROVITZ*

*October 4, 2019*

*30(b)(6) DEPOSITION*

---



## JPA REPORTING, LLC

CERTIFIED COURT REPORTERS

404-853-1811      1-888-947-2963

*Original File 1004Orovitz19.txt*

*Min-U-Script® with Word Index*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

---

| | |
|---|---|
| LEWIS LAKE,<br><br>            Plaintiff,<br><br>      vs.<br><br>HAYT, HAYT & LANDAU, P.L.,<br>a professional liability<br>company (LLC), and ELTMAN<br>LAW, P.C.,<br><br>          Defendants. | CASE NO.<br><br>1:19-CV-02457-MHC |

---

30(B)(6) DEPOSITION OF
HAYT, HAYT & LANDAU, P.L.
BY AND THROUGH ROBERT J. OROVITZ


Friday, October 4, 2019
10:00 a.m.


3355 Lenox Road, N.E.
Suite 750
Atlanta, Georgia


Lisa A. Messina, RMR, CRR, CCR-A-421

APPEARANCES OF COUNSEL


On behalf of the Plaintiff:

    RONALD EDWARD DANIELS, Esq.
    Daniels Law LLC
    P.O. Box 4939
    Eastman, Georgia 31023
    478-227-7331


On behalf of the Defendants:

    ERNEST H. KOHLMYER, III, Esq.
    Shepard, Smith, Kohlmyer & Hand, P.A.
    2300 Maitland Center Parkway
    Suite 100
    Maitland, Florida 32751
    407-622-1772


- - -

TABLE OF CONTENTS

| Plaintiff's Exhibit | Description | Page |
|---|---|---|
| Exhibit 1 | Notice of 30(b)(6) Deposition of Defendant | 4 |
| Exhibit 2 | Complaint for Damages | 5 |
| Exhibit 3 | Defendant Hayt, Hayt & Landau, P.L.'s Answer and Affirmative Defenses to Plaintiff's Complaint | 6 |
| Exhibit 4 | Email dated 10/5/18 from Breeden to Daniels | 9 |
| Exhibit 5 | Email dated 4/16/19 from Breeden to Dorsen and Daniels | 15 |
| Exhibit 6 | Defendant Hayt, Hayt & Landau P.L.'s Amended Initial Disclosures | 27 |
| Exhibit 7 | Letter dated 6/11/19 from Hayt, Hayt & Landau to Carlson and Daniels | 30 |

(Original Exhibits 1 through 7 have been attached to the original transcript.)

1          (Reporter disclosure made pursuant to
2      Article 10.B of the Rules and Regulations of the
3      Board of Court Reporting of the Judicial Council
4      of Georgia.)
5          MR. DANIELS:  This is the 30(b)(6)
6      deposition of Hayt, Hayt & Landau, P.L., a
7      professional limited liability company, in the
8      Northern District of Georgia case of Lewis Lake
9      versus Hayt, Hayt & Landau, P.L., and Eltman Law,
10     P.C., which is 1:19-CV-02457.  It's being taken
11     pursuant to notice.
12                    ROBERT J. OROVITZ,
13  having been first duly sworn, was examined and
14  testified as follows:
15                    CROSS-EXAMINATION
16  BY MR. DANIELS:
17     Q.     Would you state your name.
18     A.     Robert Orovitz.
19     Q.     And you are the 30(b)(6) deponent for
20  Hayt, Hayt, and Landau?
21     A.     Yes.
22     Q.     Prior to today were you given a copy of a
23  deposition notice with certain topics on it?
24     A.     I don't think I've seen it.
25            (Plaintiff's Exhibit 1 was marked.)

1      Q.     (By Mr. Daniels)  I hand you what I've

2   marked as Plaintiff's Exhibit P-1.  Are there any of

3   those topics you're not prepared to testify about

4   today?

5      A.     No.

6      Q.     I want to start with your background as a

7   30(b)(6) witness.

8             How are you affiliated with the Defendant?

9      A.     I am a 20 percent owner of Hayt, Hayt &

10  Landau, P.L.

11     Q.     And do you also work for it since it's a

12  law firm?

13     A.     I do.

14     Q.     And you are involved in the operations and

15  things of that nature?

16     A.     I am.

17     Q.     Do you have any titles or anything like

18  that?

19     A.     Not that I'm aware of.

20     Q.     Are you familiar with the lawsuit that

21  we're here about today?

22     A.     I am.

23     Q.     And when did you become aware of it?

24     A.     Soon after it was filed.

25             (Plaintiff's Exhibit 2 was marked.)

1      Q.      (By Mr. Daniels)  I have marked as P-2 a

2  copy of the Complaint.  If you'll take a minute to

3  review it and make sure it's the Complaint that you

4  were talking about that you became aware of.

5      A.      It may or may not be, I can only tell from

6  the title, but I don't really remember it.  I don't

7  have an independent recollection of it.

8              (Plaintiff's Exhibit 3 was marked.)

9      Q.      (By Mr. Daniels)  I'm showing you what's

10  marked as Plaintiff's Exhibit P-3 which is a copy of

11  the Answer filed or what I proffer to you is a copy of

12  the Answer that was filed.

13              Have you ever seen that document?

14      A.      No.

15      Q.      I'm going to start with going to Paragraph

16  No. -- it's probably going to work best to have them

17  side by side just so you can track what's what.  Start

18  on Page 3 of the Complaint which is also Page 3 of the

19  Answer and is Paragraph 16 in both.

20      A.      Okay.

21      Q.      Your firm is trying to collect a debt from

22  Mr. Lake?

23              MR. KOHLMYER:  Object to form.

24              THE WITNESS:  As of today?

25      Q.      (By Mr. Daniels)  Yes, sir.

1    A.    That's correct.

2    Q.    And how was that debt created?

3          MR. KOHLMYER:  Object to form.

4          THE WITNESS:  Promissory note.

5    Q.    (By Mr. Daniels)  And what was the purpose

6  of that debt?

7          MR. KOHLMYER:  Object to form.

8          THE WITNESS:  His purpose?

9    Q.    (By Mr. Daniels)  Yes.

10   A.    I believe it was student loan, but I don't

11 know what his purpose was.

12   Q.    Do you think he was taking a loan out for

13 a business?

14         MR. KOHLMYER:  Object to form.

15         THE WITNESS:  I have no idea.

16   Q.    (By Mr. Daniels)  Do you think he was

17 taking a loan out --

18   A.    I have no thoughts on what he was doing or

19 thinking.

20   Q.    Do people take student loans out for any

21 other reason other than to better the education of

22 themselves or their family?

23         MR. KOHLMYER:  Object to form.

24         THE WITNESS:  I have seen that, yes.

25   Q.    (By Mr. Daniels)  Give me an example.

1       A.      Where a person has used their student loan

2  money for any number of non-tuition-related items.

3       Q.      Do you believe that occurred with

4  Mr. Lake?

5       A.      Again, I have no thoughts about what

6  Mr. Lake did with the money.  I have no idea.

7       Q.      You've reviewed documents, though,

8  provided to you by your client?

9               MR. KOHLMYER:  To the extent that it calls

10              for any conversations or materials that would be

11              subject to the attorney-client privilege with

12              Navient I instruct you not to answer, but if you

13              have general knowledge in preparation for the

14              deposition today you can answer.

15              THE WITNESS:  I haven't.

16       Q.      (By Mr. Daniels)  So your answer is you

17  don't know what type of debt this is?

18       A.      That's not what I said.

19       Q.      You don't know what the purpose of the

20  debt was?

21       A.      I don't know what his particular purpose

22  was, but, as I said, we showed it as a student loan.

23       Q.      Do you have any reason to believe it was

24  not for personal or family purposes?

25              MR. KOHLMYER:  Object to form.

1          THE WITNESS:  I have no knowledge one way

2     or the other.

3     Q.     (By Mr. Daniels)  I take you to I believe

4     Page 4 of the Answer which is going to correspond with

5     Page 4 of the Complaint.  I want to talk about

6     Paragraph No. 26.

7     A.     Okay.

8     Q.     Since the filing of this Answer has Hayt,

9     Hayt & Landau determined whether or not the

10    October 5th, 2018, email referenced in Paragraph 26

11    was the first communication regarding Mr. Lake from

12    Hayt, Hayt & Landau?

13         MR. KOHLMYER:  To the extent that it calls

14    for any attorney-client privileged or work

15    product information in the defense of the case I

16    instruct you not to answer, but if you have

17    factual information as to belief of Hayt, Hayt &

18    Landau, as the corporate representative you can

19    answer.

20         THE WITNESS:  I don't know what that date

21    in particular communication is referring to, so

22    if you can tell me that I can maybe answer it

23    better.

24         (Plaintiff's Exhibit 4 was marked.)

25    Q.     (By Mr. Daniels)  We'll look at it.  I

1    show you what's marked as Plaintiff's Exhibit P-4

2    which is an October 5th, 2018, email.

3          A.     Okay.  Your question again, please?

4          Q.     Does Hayt, Hayt & Landau contend that

5    there was another communication prior to this email to

6    Mr. Lewis Lake regarding his account from Hayt, Hayt &

7    Landau?

8          A.     I do not believe so.

9          Q.     If there was some sort of communication

10   prior to this you would have a copy of it?

11              MR. KOHLMYER:  Object to form.  You can

12         answer, though.

13              THE WITNESS:  I would think so.

14         Q.     (By Mr. Daniels)  Is that a true and

15   accurate depiction of the email as you are aware that

16   is the first communication regarding Mr. Lewis Lake

17   from Hayt, Hayt & Landau to Mr. Lake or his attorneys?

18         A.     Well, it seems to be on law firm

19   letterhead so that's not accurate.  As to the body of

20   it, I don't have it memorized but, again, I have no

21   reason to think that it's not.

22         Q.     Does that email include a 15 USC 1692g

23   notice?

24         A.     It does not.

25         Q.     What is Hayt, Hayt & Landau's policies and

1  procedures regarding sending 1692g notices?

2      A.      I'm reading from the Hayt, Hayt & Landau

3  policy and procedure titled "Substitution of Counsel"

4  and in particular the portion that deals with

5  post-judgment communications, which is what we have

6  this as, and it says, "Post-judgment or accounts that

7  are placed with a judgment against the consumer, the

8  judgment is reviewed for accuracy with our case

9  information, a judgment status is placed on the

10  account, and our initial demand letter is generated

11  which makes reference to HHL replacing the previous

12  counsel."

13      Q.      Was that procedure followed?

14      A.      It was not.

15      Q.      Why not?

16      A.      Well, the best person to answer that is

17  Mr. Breeden whose deposition you took two weeks ago,

18  so where things went awry exactly I'm not sure.  This

19  was a very unusual situation in that the file was

20  placed with us as a post-judgment account with a batch

21  of other files that were in all stages of litigation

22  and as per our policies and procedures there was a

23  review process going on.  Before this file was

24  reviewed we received information in the office that

25  the judgment was set aside thus prompting the attorney

 1   to respond to that.

 2       Q.      And when was this policy and procedure put

 3   in place?

 4       A.      October of 2013.

 5       Q.      And was Mr. Breeden trained on this policy

 6   and procedure?

 7       A.      He was.

 8       Q.      And when was he trained on it?

 9       A.      When he was hired in 2018.

10       Q.      And that was approximately sometime

11   between February and May of 2018?

12       A.      I don't want to guess.

13       Q.      It was prior to that email being sent?

14               MR. KOHLMYER:  Object to form.

15               THE WITNESS:  Yes.

16       Q.      (By Mr. Daniels)  When did the file get

17   marked not post judgment?

18               MR. KOHLMYER:  To the extent that the

19               information calls for the revelation of

20               attorney-client privilege or work product in

21               regards to litigation that is currently pending

22               and protected by the firm I instruct you not to

23               answer.  To the extent that you know you may

24               answer.

25               THE WITNESS:  I don't know.  The person

1      who would know best and the person who did it is

2      Mr. Breeden whose deposition you took two weeks

3      ago.

4      Q.     (By Mr. Daniels)  Is Mr. Breeden here

5  today?

6      A.     Clearly not.

7      Q.     And you're the 30(b)(6) deponent?

8      A.     Yes.

9      Q.     So you're the one that is speaking on

10  behalf of the company?

11      A.     Correct.

12      Q.     Is Mr. Breeden authorized to speak on

13  behalf of the company?

14      A.     He's the person who has the most personal

15  knowledge as to this particular case.

16      Q.     That doesn't really answer my question so

17  I'll ask it again.

18      A.     Go ahead.

19      Q.     Is Mr. Breeden in a position to bind the

20  company with his answers?

21      A.     If he gave you a factual answer as to

22  when, for example, the file was moved from judgment to

23  non-judgment, he would know best.  It just requires a

24  computer to be in front of me and you didn't ask me to

25  bring anything in particular.

```
 1        Q.      Well, how do you know what I asked you to

 2   bring?

 3        A.      You didn't ask me to bring anything.

 4        Q.      You don't know that because you said you

 5   hadn't seen the deposition notice.

 6        A.      I asked my office if there was a subpoena

 7   duces tecum.

 8        Q.      So somebody has seen the deposition

 9   notice, then?

10        A.      Certainly.

11        Q.      The error that you maintain occurred is

12   Mr. Breeden simply mismarked the file?

13              MR. KOHLMYER:  Object to form.  You can

14         answer.

15              THE WITNESS:  No, that wasn't his only

16         error.

17        Q.      (By Mr. Daniels)  What was the error with

18   regard to the October 5th, 2018, email?

19        A.      I don't know that it was an error.  On

20   this I would rely on counsel.  I don't know that the

21   letter constitutes an attempt to collect a debt,

22   that's not my expertise, but it is our policy and

23   procedure for the initial communication to be the

24   30-day notice letter.

25        Q.      Well, what is your expertise?
```

1     A.    Debt collection.  So whether it was

2  required -- whether this email was an attempt to

3  collect a debt or not, I don't believe so, but I'm not

4  really the expert or the judge but it does go against

5  our policy and procedure.

6     Q.    But you're not sure if an error occurred

7  or not?

8     A.    I don't know if it was a legal error.  It

9  was definitely an error against our policy and

10  procedure.

11     Q.    And what was the error?

12     A.    In the initial communication not being the

13  initial demand letter.

14     Q.    Have you ever had training on the Fair

15  Debt Collection Practices Act?

16     A.    I have.

17     Q.    How frequently?

18     A.    At least annually.

19     Q.    And do employees get training annually on

20  the Fair Debt Collection Practices Act?

21     A.    They do.

22     Q.    And part of that is, of course, the

23  importance of having policies and procedures and

24  following them?

25     A.    Correct.

```
 1                    (Plaintiff's Exhibit 5 was marked.)
 2        Q.    (By Mr. Daniels)  I'm showing you what
 3   I've marked as Plaintiff's Exhibit P-5.
 4        A.    Okay.
 5        Q.    Are you familiar with that email?
 6        A.    Yes.
 7        Q.    What was the purpose of that email?
 8        A.    I believe Mr. Breeden's purpose was to do
 9   what he says in the email.
10        Q.    So it wasn't sent out of the kindness of
11   his heart?
12              MR. KOHLMYER:  Object to form.
13              THE WITNESS:  I don't know what was in his
14        heart.
15        Q.    (By Mr. Daniels)  It was sent to respond
16   to discovery in the pending lawsuit in the Laurens
17   County Superior Court?
18              MR. KOHLMYER:  Object to form.
19              THE WITNESS:  It appears that's what it is
20        about.
21        Q.    (By Mr. Daniels)  And that case is an
22   attempt to collect a debt?
23        A.    The case is, yes, but, theoretically
24   speaking, I don't know that responding to discovery,
25   if that's your first contact with the new attorney, I
```

1    don't know if that's an attempt to collect a debt or

2    not.

3        Q.    You just turn over documents because you

4    feel like it?

5              MR. KOHLMYER:  Object to form.  You can

6              answer if you know.

7              THE WITNESS:  No.  It would have been in

8              response to their defense, but I don't know that

9              that in itself is an attempt to collect a debt.

10             There certainly would be a point in the

11             litigation where we go, so to speak, on the

12             offensive where we're attempting to collect a

13             debt.  But providing documents to the other side,

14             I don't know if that would be an attempt to

15             collect a debt or not.

16       Q.    (By Mr. Daniels)  What is Hayt, Hayt &

17   Landau's policy and procedure regarding contacting

18   third parties?

19       A.    I'm reading from the Hayt, Hayt & Landau

20   "Letter Policy and Procedures."  In part it says that

21   "It's the policy of HHL not to send any letters to

22   third parties on any accounts unless HHL receives

23   written or verbal permission from the consumer

24   directly.  Additionally, it is HHL's policy not to

25   verbally communicate with any other than the consumer,

1    including spouses, neighbors, third parties,

2    employers, without authorization from the consumer

3    directly."

4        Q.    Did Hayt, Hayt & Landau have authorization

5    from Mr. Lake to communicate with an attorney named

6    Cliff Dorsen?

7        A.    No.

8        Q.    Does your policy define letters as to also

9    include email communication?

10       A.    Yes.

11       Q.    So why did an email get sent to Cliff

12    Dorsen?

13              MR. KOHLMYER:  Object to form.  You can

14            answer if you know.

15              THE WITNESS:  Mr. Breeden did not follow

16            the Hayt, Hayt & Landau policy in that he did a

17            couple of things wrong.  He just -- it was just a

18            fat finger -- sent it to the wrong Cliff, but

19            that wouldn't have happened had he followed our

20            policy and procedure in how to send out emails

21            generally which is contained in our

22            communications policy and procedure.

23       Q.    (By Mr. Daniels)  Let's talk about that.

24    What does it say?

25       A.    "If necessary to communicate via email

1    outside the office due to a court order or attorney/

2    consumer request, all emails are sent to the

3    consumer's file and a designated manager or attorney

4    in order to keep track of content, time, date, and

5    attachments to such email."  It's longer than that but

6    that's the germane part.

7        Q.     Was Mr. Breeden trained on that policy?

8        A.     He was.

9        Q.     And do you know whether or not he was

10   complying generally with that policy?

11        A.     I would believe so.

12        Q.     And if he wasn't complying with that

13   policy it would be a problem?

14        A.     Yes.

15        Q.     And let's say he didn't comply with that

16   policy for an entire year.  Would that be a problem?

17            MR. KOHLMYER:  Object to form.

18            THE WITNESS:  I mean, that's way

19        speculation, but if he didn't comply with it for

20        a day it's a problem; two days is a bigger

21        problem.

22        Q.     (By Mr. Daniels)  364 an even bigger

23   problem?

24        A.     Yes.

25        Q.     Does Hayt, Hayt & Landau have a policy and

1    procedure for dealing with third-party disclosures,

2    what to do after one has been made?

3         A.    I don't know that there's one in

4    particular.  Every case would be different.  If it's a

5    verbal communication and you can't take it back, I

6    believe that the email says on it -- typically the

7    emails have a disclaimer at the bottom if you're not

8    the intended user and there's some verbiage there.

9              Also, in this particular case, the one

10   that went to the wrong Cliff, the content of the email

11   was encrypted and the encryption key was sent via

12   separate email that did not go to the wrong Cliff.  So

13   the only thing that the wrong Cliff got I believe was

14   just the reference and no confidential information so

15   there was nothing to pull back, to tell him to ignore.

16        Q.    Does your policy and procedure say

17   anything about confidential information versus

18   non-confidential information?

19        A.    No.  We don't disclose any information.

20        Q.    So this whole distinguishment between

21   confidential and not confidential information is

22   irrelevant?

23        A.    No, because you asked about what we would

24   do if there was a breach.  If we disclosed anything

25   that wasn't, for example, already in the public

1  record, we would take whatever steps would be

2  necessary to re-call that disclosure.  In this

3  particular case there was nothing to re-call.  I

4  believe, if I'm looking at the email correctly, the

5  only information that the wrong Cliff got was a case

6  style which is a public record, so there was nothing

7  for us to call back.

8      Q.    You don't think it's significant that

9  Mr. Dorsen didn't know that Mr. Lake was being sued?

10          MR. KOHLMYER:  Object to the form.

11          THE WITNESS:  Is Mr. Dorsen the wrong

12      Cliff?

13      Q.    (By Mr. Daniels)  Yes.

14      A.    And, I'm sorry, your question again?

15      Q.    It's not significant to you that

16  Mr. Dorsen didn't know that Mr. Lake was being sued?

17          MR. KOHLMYER:  Object to form.

18          THE WITNESS:  Significant?

19          MR. KOHLMYER:  Are you asking him in his

20      individual capacity or as the corporate rep?

21          MR. DANIELS:  As the corporate rep.

22          THE WITNESS:  Well, it's a violation of

23      our policy not to disclose any information and to

24      the extent that sending an email to the wrong

25      Cliff violates that policy it's significant to my

1      office.

2      Q.      (By Mr. Daniels)  How do you enforce these

3      policies and procedures?

4      A.      We have people who do nothing but comb

5      through files and look for compliance matters, they

6      listen to phone calls, and we look at letters.

7      Compliance has become a huge part of this business.

8              Should somebody not follow a policy or

9      procedure there's a number of steps taken for

10     remediation.  They're retrained on the policy.  If

11     they can't seem to get it right, they'll be let go.

12     Q.      We're going to come back to that because

13     you kind of gave a long answer and there's a couple of

14     questions from the start of it.

15             The compliance people, do they see emails?

16     A.      They do if the person complies with the

17     initial policy of sending it through our system of

18     record.

19     Q.      Would it be a red flag to somebody if an

20     employee had been there for, say, three months and

21     they didn't see a single email in the system from?

22             MR. KOHLMYER:  Object to form.  You can

23             answer if you know.

24             THE WITNESS:  I don't think so because the

25             office was just sort of gearing up, so I don't

1    know that that would be a red flag or not.

2        Q.    (By Mr. Daniels)  What if it was six

3    months?

4            MR. KOHLMYER:  Same objection.  You can

5        answer.

6            THE WITNESS:  I'm not sure, but I don't

7        know that our auditing process -- let me take

8        that back.  It depends on the person.

9        Q.    (By Mr. Daniels)  Okay.  What if it was an

10    attorney?

11        A.    I would expect that attorneys would have

12    email exchanges with other attorneys.  Most of our

13    files, though, are not attorney files, they seem to be

14    pro se, so I don't know at what point I would be

15    concerned if there were no emails and I certainly

16    don't know that that's the case.

17        Q.    So in terms of remediation that was done

18    -- you said one of the things you do to enforce the

19    policy is to provide remedial training?

20        A.    Correct.

21        Q.    What sort of remedial training was done

22    with Mr. Breeden?

23        A.    That was done by somebody else so I don't

24    know.

25        Q.    Who would know?

1      A.      Dana Stern and Mr. Breeden whose

2  deposition you took two weeks ago.

3      Q.      Are those the only two people who would

4  know for both instances whether there was an error?

5      A.      I don't follow your question.

6      Q.      If I understand your testimony correctly,

7  HHL is maintaining there were two errors that

8  occurred?

9      A.      No.  I'm not saying that there's any

10  errors.  To the extent that you're saying there were

11  errors, I'm identifying them as two different

12  instances.

13      Q.      I'm not suggesting there are any errors.

14  I'm suggesting that you violated the law.

15      A.      Okay.

16          MR. KOHLMYER:  Object to form.

17      Q.      (By Mr. Daniels)  So are there any errors

18  that occurred that resulted in a violation of the law

19  or not?

20          MR. KOHLMYER:  Object to form.

21          THE WITNESS:  To the extent that there is

22          a violation of law, which I'm not prepared to say

23          there is or is not, there were definitely

24          violations of policy.

25      Q.      (By Mr. Daniels)  With respect to the

1    October 5th email, was Mr. Breeden provided with

2    remediation training?

3        A.    He was, but I don't believe that we knew

4    about that instance until we were served with the

5    lawsuit.

6        Q.    And with respect to the third-party

7    disclosure, was he provided with remedial training?

8        A.    Same answer.

9        Q.    So it all would have occurred after -- I

10    think it was filed June 13th, June 14th -- whatever

11    day it was filed in June of this year?

12        A.    Remedial to the extent it deals with this

13    file, but we're all undergoing constant training.  So

14    the day after he sent out the October letter he may

15    have received additional training that was germane.

16    I'm not saying that.  I'm just saying that when you

17    talk about remedial I get the impression you're

18    talking about to remedy a specific error.  The

19    specific error did not come to our attention until the

20    suit was filed, but he's constantly being trained.

21        Q.    I guess to clarify, I picked up the word

22    remediation from your answer so you tell me what you

23    meant.  I don't want you to try to guess what you

24    think I meant.

25        A.    Our employees are constantly being trained

1  and supervised.  To me that's not remedial, that's

2  just training and supervision.  Remedial occurs when

3  we learn of a specific instance an employee has not

4  followed our policy and we have a specific instance to

5  remedy.

6       Q.     So Mr. Breeden got both that type of

7  training as well as the constant supervision and

8  training that occurs?

9       A.     Correct.

10      Q.     Does anybody keep a log on who is trained

11 on what, when, and where?

12      A.     There are certain matters that there would

13 be a record of, for example, examinations that

14 employees might take, but I would say generally, to

15 answer your question, generally not.

16      Q.     The person who provided the remedial

17 training, I think you said it was Dana Stern?

18      A.     Correct.

19      Q.     Are they in the Atlanta office or the

20 Florida office?

21      A.     Florida.

22      Q.     Does HHL have offices anywhere else other

23 than Florida and Atlanta?

24      A.     No.

25      Q.     My understanding is at least you have

1    collection efforts in other states other than Georgia

2    and Florida?

3        A.      No.

4        Q.      Has HH&L ever been sued in other states

5    other than Florida or Georgia?

6        A.      Not that I'm aware of.

7                (Plaintiff's Exhibit 6 was marked.)

8        Q.      (By Mr. Daniels)  I show you what I've

9    marked as P-6.  I think, if I got the right one, it's

10   Hayt, Hayt & Landau's amended initial disclosures in

11   this case.

12               Are you familiar with those?

13       A.      I'm not.

14       Q.      Does Hayt, Hayt & Landau have an insurance

15   policy?

16       A.      I hope so.

17       Q.      You don't know?

18       A.      I would assume so.

19       Q.      You're a 20 percent shareholder, you

20   personally --

21       A.      I am.

22       Q.      -- and you don't know whether or not you

23   have any sort of errors and omissions coverage?

24       A.      I would certainly hope so.

25       Q.      Who would know?

1      A.     The managing partner.

2      Q.     Is that Ms. Stern?

3      A.     It is.

4      Q.     And to your knowledge, and I'm talking

5 about you as the company, if there was a policy of

6 insurance, that is something that could be provided if

7 required by the Federal Rules of Evidence and Civil

8 Procedure?

9      A.     I would assume so.

10     Q.     Are you aware of a situation where Hayt,

11 Hayt & Landau is being sued for sending post-judgment

12 deposition notices?

13     A.     No.

14     Q.     Is there another debt collector out there

15 named Hayt, Hayt & Landau?

16     A.     Yes.

17     Q.     And where are they based?

18     A.     It's been a long time since I've thought

19 about other Hayt, Hayt & Landau offices.  I recall

20 there being offices in New York, New Jersey,

21 Pennsylvania.  I don't know where else they could be.

22     Q.     Were they ever affiliated with your Hayt,

23 Hayt & Landau?

24     A.     We had a common ancestry, but the law

25 firms have never been affiliated.

1      Q.      So kind of explain that because -- I think

2  I know but I don't want to guess at that.

3      A.      So long ago and far away there was a law

4  firm called Hayt, Hayt & Landau and it was based out

5  of New York.  In 1987 that law firm ceased to be and

6  became a collection agency.

7      Q.      Okay.

8      A.      Speaking for myself, I was given the

9  opportunity to open a law office called Hayt, Hayt &

10  Landau in Florida.  Initially it was me doing business

11  as Hayt, Hayt & Landau.  That lasted about a year.  It

12  was Robert J. Orovitz, P.A., doing business as Hayt,

13  Hayt & Landau.  I think in 2009 it became Hayt, Hayt &

14  Landau, P.L.

15          I don't know the stories of the other

16  states, what their genesis was, but I know that for a

17  while there were other offices that called themselves

18  Hayt, Hayt & Landau something, could have been Inc.,

19  but using those three words to start the name.  But

20  from 1987 when I took over the law firm and the larger

21  law firm ceased to exist we have had no relationship

22  with those other law firms.

23      Q.      So did that ever cause any confusion

24  before?

25      A.      I would say in the first year or so we had

1    to explain what was happening but not since then.

2              MR. DANIELS:  I'm going to refill my

3        coffee cup and take about a four-minute break, so

4        if y'all want to take a break.

5              (Recess from 10:50 a.m. to 10:52 a.m.)

6              MR. DANIELS:  We're back on the record and

7        we're going to go to Plaintiff's Exhibit P-7.

8              (Plaintiff's Exhibit 7 was marked.)

9        Q.    (By Mr. Daniels)  Have you ever seen that

10   one before?

11       A.    Yes.

12       Q.    What is it?

13       A.    That's the initial demand letter.

14       Q.    And when was that one sent?

15       A.    I can only go by the date on there of

16   June 11th, 2019.

17       Q.    Does Hayt, Hayt & Landau keep like a log

18   of activity on a file?

19       A.    Yes.

20       Q.    And would it keep track of when a

21   communication like this is sent out?

22       A.    Yes.

23       Q.    And I guess why was this one sent out?

24       A.    It was sent out -- I imagine that that

25   date is pretty close to the date that we were served

1  with the lawsuit which is when we would have learned

2  that we had not sent out one initially.

3      Q.    I want to rewind a little bit and I don't

4  want to ask you and I'm not trying to get an answer

5  that tells me some super-secret thing to do with your

6  client, either Sallie Mae or whoever it is.  I'm

7  curious when approximately this file was placed with

8  your office.

9      A.    I don't know.

10     Q.    Do you recall if your office picked up a

11 bunch of files from Eltman Law?

12     A.    Like physical files?

13     Q.    I don't think you can --

14     A.    Like a truck?

15     Q.    I don't think that happened, but when did

16 y'all get assigned some business from Navient that

17 this would have potentially been included in?

18     A.    I don't have the date.

19     Q.    Do you know an approximate time?

20     A.    I don't.  Again, Mr. Breeden probably

21 would have been the right person to answer that.

22     Q.    Well, he didn't know.

23     A.    I know less than him.

24     Q.    Okay.  Do you remember if you hired

25 Mr. Breeden before or after those files came over?

1    And when I say came over, were assigned or placed or

2    whatever happened.

3        A.    So there's no truck; it's all electronic.

4    Can you ask the question again?

5        Q.    Do you know if the Navient client became a

6    client of HHL or whoever the entity is before or after

7    Mr. Breeden was hired?

8        A.    Well, Navient was a client of the law firm

9    in Florida prior to our opening an office in Georgia.

10    They've been a client for a while so I don't know if

11    that's what you really want to know.  Is it more like

12    when we got this batch of files?

13        Q.    Yes.

14        A.    So that I don't know.

15        Q.    You don't know whether it was before or

16    after Mr. Breeden was hired?

17        A.    I need to tell you a little bit of a

18    story.

19        Q.    Okay.

20        A.    I know you don't like stories.

21            MR. KOHLMYER:  As long as it's responsive

22        to the question.

23            THE WITNESS:  It's just background that's

24        necessary.

25            Prior to hiring Mr. Breeden, Hayt, Hayt &

1  Landau was in Georgia using two attorneys, Brian

2  Gardner and Wes Dunlap.  They were the attorneys

3  for Hayt, Hayt & Landau in Georgia.  That was not

4  working out.

5  After Eltman closed and Mr. Breeden no

6  longer had a job, I hired Mr. Breeden.  There's

7  an overlap period where Wes and Brian were still

8  our lawyers in Georgia while we got a physical

9  office up and running and trained Mr. Breeden.

10  I don't know if we received these Navient

11  files -- I don't know.  That's probably what I

12  should have just said, I don't know.

13  Q.  (By Mr. Daniels)  And that's a fair

14  answer.  I don't know if it would stick out in my mind

15  when a file hits my office.  You can't imagine how

16  many files you look at in a given year.  I know the

17  few hundred I look at, I couldn't tell you at what

18  point in time File Z was placed with me.  I was just

19  curious if Mr. Breeden was involved at all in getting

20  files from Eltman.

21  A.  I believe he was and in particular the

22  Navient files because he was the attorney at Eltman

23  who worked the files and then he was the attorney who

24  worked them in my office.  There may have been a time

25  when they were in our computer, but we had to go

1  through a process of reviewing them one at a time and

2  I believe that's what Mr. Breeden -- one of his first

3  jobs was.

4      Q.    Do you know when he completed that review?

5      A.    I don't think it's been completed yet.

6      Q.    I would imagine that we're talking not a

7  handful of files but a lot?

8      A.    More than a handful.

9      Q.    I want to go back to that June 11th, 2019,

10  letter.

11            At that time, had anybody at Hayt, Hayt &

12  Landau actually reviewed Mr. Lake's file?

13     A.    Yes.

14     Q.    So when this letter says that "At this

15  time, no attorney with this law firm has personally

16  reviewed the particular circumstances of your

17  account," that is incorrect?

18     A.    I don't know that they reviewed -- I don't

19  know what was reviewed.  Again, that would have been

20  Mr. Breeden.  Because of the lawsuit this file had

21  garnered attention.

22     Q.    So on behalf of HH&L, had any attorney at

23  HH&L personally reviewed Mr. Lake's account prior to

24  this letter being sent out?

25            MR. KOHLMYER:  Subject to any

1  attorney-client privilege or work product in

2  regards to looking at the file, I instruct you

3  not to answer.  If you factually know you may

4  answer.

5  THE WITNESS:  I don't factually no.  I'm

6  really just kind of guessing when I'm talking

7  about who knew what, just what I would guess.  I

8  know I'm not supposed to do that.

9  Q.    (By Mr. Daniels)  Would it be a problem if

10  Mr. Breeden had been responding to discovery requests

11  and otherwise attempting to collect a debt against

12  Mr. Lake and not have reviewed anything on the

13  account?

14  A.    Well, it would be fairly difficult to

15  respond to discovery without reviewing the file.

16  Q.    Who is this letter addressed to?

17  A.    Clifford Carlson.

18  Q.    And what email address was it sent to?

19  A.    cc@cliffcarlsonlaw.com.

20  Q.    And who is the salutation to?

21  A.    Mr. Ronald Daniels.

22  Q.    I know him.  He's a very nice man.

23  Does anybody review this letter before it

24  gets sent out, or do you just hit a button and it

25  spits out a letter?

1    A.    It could be either way.

2    Q.    In this case?

3    A.    I don't know.

4    Q.    Is there any sort of activity log that

5    would tell you?

6    A.    No.

7    Q.    When somebody reviews a letter they don't

8    notate it anywhere?

9    A.    I don't believe so.

10    Q.    This letter says it is an attempt to

11    collect a debt.  Is this an attempt to collect a debt

12    in your mind?

13    A.    What is an attempt to collect a debt?

14    Q.    This letter.

15    A.    I think it's a notice that says that we

16    are about to.  The letter says what the letter says.

17    Q.    At the time HH&L sent this letter, did it

18    understand Mr. Lake was disputing this debt?

19         MR. KOHLMYER:  Object to form.

20         THE WITNESS:  I don't know if that's true

21    or not.

22    Q.    (By Mr. Daniels)  If Mr. Lake was

23    disputing the debt, would HH&L have kept a record of

24    that somewhere?

25    A.    Yes.  If somebody writes to us and says

1    that they are disputing the debt we do have a way to

2    notate that.

3         Q.    And if their lawyers disputed it in

4    response to a lawsuit, would you note that?

5         A.    If a lawyer filed an Answer -- I believe

6    it depends on the nature of the dispute.  If a person

7    says I never had this credit card or I did not sign

8    that note we would notate it.  If a person claims

9    fraud we would notate it.  If an attorney files an

10   answer that raises 30 form affirmative defenses and

11   they are just what they pulled out of their form book

12   and it says there's a cause of action, statute of

13   limitations, estoppel, waiver, 20 different

14   affirmative defenses that just -- they file the same

15   answer over and over and over again, I don't know that

16   we would consider that a dispute.

17        Q.    Do you have a problem with people using

18   forms?

19        A.    None whatsoever.  I use them all the time.

20        Q.    I was going to say, I've seen a lot of

21   complaints and they all pretty much look the same.

22        A.    But here's the difference between a

23   complaint and an answer.  Our complaints may be

24   formulaic because of our situation from the

25   plaintiff's perspective.  Generally it's the same for

1    each debtor.  But a defense attorney that raises 30

2    form defenses, 29 or 30 of which have no bearing

3    whatsoever, I do personally have an issue with that,

4    where they raised perhaps failure to attach assignment

5    as a defense but the plaintiff isn't an original

6    creditor, but that's just my personal opinion.

7        Q.    So you wouldn't have a problem with

8    somebody filing an answer with like five affirmative

9    defenses?

10        A.    I don't have a problem with anyone filing

11    any answer with however many defenses they want to

12    file.  I just think it should be -- well, never mind.

13    It's just a personal opinion.

14        Q.    Clearly if somebody is filing an answer

15    saying failure to attach an assignment and it's an

16    original creditor, that's not relevant?

17        A.    Right.

18        Q.    So your issue is really with people that

19    are filing forms that really don't apply to the facts

20    that are presented?

21        A.    And it's not that I have an issue, I'm

22    just having a friendly discussion with you regarding

23    forms.  Plaintiffs use them and defense use them,

24    courts use them, but sometimes lawyers get lazy and

25    they don't apply it.

1      Q.      Who at HH&L caused this June 11th letter

2    to be sent?

3      A.      It would have been probably Mr. Breeden.

4      Q.      Does HH&L have a policy and procedure on

5    not making false statements in communications to

6    debtors or their attorneys?

7      A.      I would say so.

8      Q.      I don't think I asked the policy and

9    procedure regarding third-party communications.  When

10   was it enacted and put into effect?

11     A.      We're talking about the one that I said

12   was titled "Communications"?

13     Q.      Yes.

14     A.      It first went into effect December of 2012

15   and there's a list of reviews and changes.

16     Q.      When was the last review?

17     A.      November 13th, 2018.

18     Q.      Do you know what was changed?

19     A.      Nothing was changed.

20     Q.      It was just reviewed?

21     A.      Correct.

22     Q.      Was the other policy and procedure we

23   talked about, the one involving initial communications

24   and I guess substitution to counsel, was it reviewed

25   or changed at any point in time?

1    A.    We talked about three different policies

2  and procedures.  We just talked about the one called

3  "Communications."  I talked about the one called

4  "Substitution of Counsel" which is the one that

5  required when we get a file that's already been with a

6  law firm that we review the file and then send out the

7  initial demand letter.  That one is titled

8  "Substitution of Counsel."  It was created in October

9  of 2013 and never changed.

10    Q.    What about the other one?

11    A.    The other one, it's titled "Letter Policy

12  and Procedure" where it discusses not sending letters

13  to third parties on any accounts and was created

14  December of 2012.  The last change was in August of

15  2017 and the change description is "Updated IDL, have

16  meaningful attorney involvement."  It's not germane to

17  this paragraph I read to you but that's a description

18  of the change.

19    Q.    That's the policy regarding letters and

20  communications?

21    A.    It's really two different policies.  One

22  just says, "Generally it is the policy of HHL not to

23  send any letters to third parties on any accounts

24  unless HHL receives written or verbal permission from

25  the consumer directly.  Additionally, it's HHL's

1   policy not to verbally communicate with anyone other

2   than the consumer."

3       Q.      So the change or addition had nothing to

4   do with that section?

5       A.      Correct.

6       Q.      As I understand it, the HHL that you are

7   here representing, has it ever been sued for a

8   violation of the Fair Debt Collection Practices Act to

9   your knowledge?

10      A.      Yes.

11      Q.      Was that in Georgia or Florida?

12      A.      Florida.

13      Q.      It's never been sued in Georgia?

14      A.      Not to my knowledge besides this one.

15      Q.      Actually, I wasn't talking about this one.

16      A.      I wanted to be clear.

17              MR. DANIELS:  Those are all the questions

18      I have for you.

19              MR. KOHLMYER:  No questions.  He'll read.

20              MR. DANIELS:  And we are ordering a copy.

21              (Deposition concluded at 11:16 a.m.)

22              (Pursuant to Rule 30(e) of the Federal

23      Rules of Civil Procedure and/or O.C.G.A. 9-11-30(e),

24      signature of the witness has been reserved.)

25

1        CERTIFICATE OF COURT REPORTER

2

3    STATE OF GEORGIA:

4    COUNTY OF FULTON:

5

6              I hereby certify that the foregoing
     transcript was reported as stated in the caption and
7    the questions and answers thereto were reduced to
     writing by me; that the foregoing 41 pages represent a
8    true, correct, and complete transcript of the evidence
     given on Friday, October 4, 2019, by the witness,
9    Robert J. Orovitz, who was first duly sworn by me.

10             I certify that I am not disqualified
     for a relationship of interest under
11   O.C.G.A. 9-11-28(c); I am a Georgia Certified Court
     Reporter here as an independent contractor of
12   JPA Reporting, LLC who was contacted by
     Ronald Edward Daniels to provide court reporting
13   services for the proceedings; I will not be taking
     these proceedings under any contract that is
14   prohibited by O.C.G.A. 15-14-37(a) and (b) or
     Article 7.C. of the Rules and Regulations of the
15   Board; and by the attached disclosure form I confirm
     that neither I nor JPA Reporting, LLC are a party to a
16   contract prohibited by O.C.G.A. 15-14-37(a) and (b) or
     Article 7.C. of the Rules and Regulations of the
17   Board.

18             This 23rd day of October, 2019.

19

20

21        _____
          LISA A. MESSINA
22        CERTIFIED COURT REPORTER
          GEORGIA CERTIFICATE NO. CCR-A-421
23

24

25

1                    DISCLOSURE OF NO CONTRACT

2

3              I, Lynn Pyles, do hereby disclose pursuant
to Article 10.B of the Rules and Regulations of the
4   Board of Court Reporting of the Judicial Council of
Georgia that JPA Reporting, LLC was contacted by the
5   party taking the proceedings to provide court
reporting services for these proceedings and there is
6   no contract that is prohibited by O.C.G.A. 15-14-37(a)
and (b) or Article 7.C. of the Rules and Regulations
7   of the Board for the taking of these proceedings.

8              There is no contract to provide reporting
services between JPA Reporting, LLC or any person with
9   whom JPA Reporting, LLC has a principal and agency
relationship nor any attorney at law in this action,
10  party to this action, party having a financial interest
in this action, or agent for an attorney at law in
11  this action, party to this action, or party having a
financial interest in this action.  Any and all
12  financial arrangements beyond our usual and customary
rates have been disclosed and offered to all parties.

13
              This 23rd day of October, 2019.
14

15
                    _____
16                  LYNN PYLES, FIRM REPRESENTATIVE
                    JPA REPORTING, LLC
17

18

19

20

21

22

23

24

25

1    DEPOSITION OF:   ROBERT J. OROVITZ/ LAM

2         I do hereby certify that I have read all
     questions propounded to me and all answers given by me
3    on October 4, 2019, taken before Lisa A. Messina, and
     that:
4
               1)   There are no changes noted.
5              2)   The following changes are noted:

6         Pursuant to Rule 30(e) of the Federal Rules of
     Civil Procedure and/or the Official Code of Georgia
7    Annotated 9-11-30(e), both of which read in part:  Any
     changes in form or substance which you desire to make
8    shall be entered upon the deposition...with a
     statement of the reasons given...for making them.
9    Accordingly, to assist you in effecting corrections,
     please use the form below:

10

11   Page No.        Line No.        should read:

12   Reason for change:

13   Page No.        Line No.        should read:

14   Reason for change:

15   Page No.        Line No.        should read:

16   Reason for change:

17   Page No.        Line No.        should read:

18   Reason for change:

19   Page No.        Line No.        should read:

20   Reason for change:

21   Page No.        Line No.        should read:

22   Reason for change:

23   Page No.        Line No.        should read:

24   Reason for change:

25

```
 1   DEPOSITION OF:  ROBERT J. OROVITZ/ LAM

 2   Page No.      Line No.      should read:

 3   Reason for change:

 4   Page No.      Line No.      should read:

 5   Reason for change:

 6   Page No.      Line No.      should read:

 7   Reason for change:

 8   Page No.      Line No.      should read:

 9   Reason for change:

10   Page No.      Line No.      should read:

11   Reason for change:

12

13   If supplemental or additional pages are necessary,
     please furnish same in typewriting annexed to this
14   deposition.

15

16                    ROBERT J. OROVITZ

17   Sworn to and subscribed before me,
     This the      day of            , 20    .
18

19   Notary Public
     My commission expires:
20

21

22   Please forward corrections to:

23                  JPA Reporting, LLC
             2900 Delk Road, Suite 700, #316
24             Marietta, Georgia 30067
                    404-853-1811
25
```

LEWIS LAKE vs.
HAYT, HAYT & LANDAU, et al.

30(b)(6) DEPOSITION

ROBERT J. OROVITZ
October 4, 2019

## A

**account (6)** 10:6;11:10,20; 34:17,23;35:13
**accounts (4)** 11:6;17:22; 40:13,23
**accuracy (1)** 11:8
**accurate (2)** 10:15,19
**Act (3)** 15:15,20;41:8
**action (1)** 37:12
**activity (2)** 30:18;36:4
**actually (2)** 34:12;41:15
**addition (1)** 41:3
**additional (1)** 25:15
**Additionally (2)** 17:24;40:25
**address (1)** 35:18
**addressed (1)** 35:16
**affiliated (3)** 5:8;28:22,25
**affirmative (3)** 37:10,14;38:8
**Again (3)** 8:5;10:3,20; 13:17;21:14;31:20;32:4; 34:19;37:15
**against (4)** 11:7;15:4,9; 35:11
**agency (1)** 29:6
**ago (4)** 11:17;13:3;24:2; 29:3
**ahead (1)** 13:18
**amended (1)** 27:10
**ancestry (1)** 28:24
**and/or (1)** 41:23
**annually (2)** 15:18,19
**appears (1)** 16:19
**apply (2)** 38:19,25
**approximate (1)** 31:19
**approximately (2)** 12:10; 31:7
**Article (1)** 4:2
**aside (1)** 11:25
**assigned (2)** 31:16;32:1
**assignment (2)** 38:4,15
**assume (2)** 27:18;28:9
**Atlanta (2)** 26:19,23
**attach (2)** 38:4,15
**attachments (1)** 19:5
**attempt (9)** 14:21;15:2; 16:22;17:1,9,14;36:10,11, 13
**attempting (2)** 17:12;35:11
**attention (2)** 25:19;34:21
**attorney (13)** 11:25;16:25; 18:5;19:3;23:10,13;33:22, 23;34:15,22;37:9;38:1; 40:16
**attorney/ (1)** 19:1
**attorney-client (4)** 8:11;9:14; 12:20;35:1
**attorneys (4)** 10:17;23:11, 12;33:1,2;39:6
**auditing (1)** 23:7
**August (1)** 40:14
**authorization (2)** 18:2,4

**authorized (1)** 13:12
**aware (6)** 5:19,23;6:4; 10:15;27:6;28:10
**away (1)** 29:3
**awry (1)** 11:18

## B

**back (7)** 20:5,15;21:7; 22:12;23:8;30:6;34:9
**background (5)** 5:6;32:23
**based (2)** 28:17;29:4
**batch (2)** 11:20;32:12
**bearing (1)** 38:2
**became (4)** 6:4;29:6,13; 32:5
**become (2)** 5:23;22:7
**behalf (3)** 13:10,13;34:22
**belief (1)** 9:17
**besides (1)** 41:14
**best (4)** 6:16;11:16;13:1,23
**better (2)** 7:21;9:23
**bigger (2)** 19:20,22
**bind (1)** 13:19
**bit (2)** 31:3;32:17
**Board (1)** 4:3
**body (1)** 10:19
**book (1)** 37:11
**both (3)** 6:19;24:4;26:6
**bottom (1)** 20:7
**breach (1)** 20:24
**break (2)** 30:3,4
**Breeden (26)** 11:17;12:5; 13:2,4,12,19;14:12;18:15; 19:7;23:22;24:1;25:1;26:6; 31:20,25;32:7,16,25;33:5,6, 9,19;34:2,20;35:10;39:3
**Breeden's (1)** 16:8
**Brian (2)** 33:1,7
**bring (3)** 13:25;14:2,3
**bunch (1)** 31:11
**business (3)** 7:13;22:7; 29:10,12;31:16
**button (1)** 35:24

## C

**call (1)** 21:7
**called (5)** 29:4,9,17;40:2,3
**calls (4)** 8:9;9:13;12:19; 22:6
**came (3)** 31:25;32:1
**can (15)** 6:5,17;8:14;9:18, 22,22;10:11;14:13;17:5; 18:13;22:22;23:4;30:15; 31:13;32:4
**capacity (1)** 21:20
**card (1)** 37:7
**Carlson (1)** 35:17
**case (13)** 4:8;9:15;11:8; 13:15;16:21,23;20:4;9;21:3, 5;23:16;27:11;36:2
**cause (2)** 29:23;37:12

**caused (1)** 39:1
**cc@cliffcarlsonlawcom (1)** 35:19
**ceased (2)** 29:5,21
**certain (2)** 4:23;26:12
**Certainly (4)** 14:10;17:10; 23:15;27:24
**change (4)** 40:14,15,18; 41:3
**changed (4)** 39:18,19,25; 40:9
**changes (1)** 39:15
**circumstances (1)** 34:16
**Civil (2)** 28:7;41:23
**claims (1)** 37:8
**clarify (1)** 25:21
**clear (1)** 41:16
**Clearly (2)** 13:6;38:14
**client (9)** 18:6,11,18;20:10, 12,13;21:5,12,25
**Cliff (9)** 18:6,11,18;20:10, 12,13;21:5,12,25
**Clifford (1)** 35:17
**close (1)** 30:25
**closed (1)** 33:5
**coffee (1)** 30:3
**collect (12)** 6:21;14:21; 15:3;16:22;17:1,9,12,15; 35:11;36:11,11,13
**collection (6)** 15:1,15,20; 27:1;29:6;41:8
**collector (1)** 28:14
**comb (1)** 22:4
**common (1)** 28:24
**communicate (4)** 17:25; 18:5,25;41:1
**communication (10)** 9:11, 21;10:5,9,16;14:23;15:12; 18:9;20:5;30:21
**communications (8)** 11:5; 18:22;39:5,9,12,23;40:3,20
**company (5)** 4:7;13:10,13, 20;28:5
**Complaint (5)** 6:2,3,18;9:5; 37:23
**complaints (2)** 37:21,23
**completed (2)** 34:4,5
**compliance (3)** 22:5,7,15
**complies (1)** 22:16
**comply (2)** 19:15,19
**complying (2)** 19:10,12
**computer (1)** 13:24;33:25
**concerned (1)** 23:15
**concluded (1)** 41:21
**confidential (4)** 20:14,17,21, 21
**confusion (1)** 29:23
**consider (1)** 37:16
**constant (2)** 25:13;26:7
**constantly (2)** 25:20,25
**constitutes (1)** 14:21
**consumer (7)** 11:7;17:23, 25;18:2;19:2;40:25;41:2

**consumer's (1)** 19:3
**contact (1)** 16:25
**contacting (1)** 17:17
**contained (1)** 18:21
**contend (1)** 10:4
**content (2)** 19:4;20:10
**conversations (1)** 8:10
**copy (6)** 4:22;6:2,10,11; 10:10;41:20
**corporate (3)** 9:18;21:20,21
**correctly (2)** 21:4;24:6
**correspond (1)** 9:4
**Council (1)** 4:3
**Counsel (5)** 11:3,12;14:20; 39:24;40:4,8
**County (1)** 16:17
**couple (2)** 18:17;22:13
**course (1)** 15:22
**Court (3)** 4:3;16:17;19:1
**courts (1)** 38:24
**coverage (1)** 27:23
**created (3)** 7:2;40:8,13
**credit (1)** 37:7
**creditor (2)** 38:6,16
**CROSS-EXAMINATION (1)** 4:15
**cup (1)** 30:3
**curious (2)** 31:7;33:19
**currently (1)** 12:21

## D

**Dana (2)** 24:1;26:17
**DANIELS (40)** 4:5,16;5:1; 6:1,9,25;7:5,9,16,25;8:16; 9:3,25;10:14;12:16;13:4; 14:17;16:2,15,21;17:16; 18:23;19:22;21:13,21;22:2; 23:2,9;24:17,25;27:8;30:2, 6,9;33:13;35:9,21;36:22; 41:17,20
**date (6)** 9:20;19:4;30:15,25, 25;31:18
**day (3)** 19:20;25:11,14
**days (1)** 19:20
**dealing (1)** 20:1
**deals (2)** 11:4;25:12
**debt (24)** 6:21;7:2,6;8:17, 20;14:21;15:1,3,15,20; 16:22;17:1,9,13,15;28:14; 35:11;36:11,11,13,18,23; 37:1;41:8
**debtor (1)** 38:1
**debtors (1)** 39:6
**December (2)** 39:14;40:14
**Defendant (1)** 5:8
**defense (5)** 9:15;17:8;38:1, 5,23
**defenses (5)** 37:10,14;38:2, 9,11
**define (1)** 18:8
**definitely (1)** 15:9;24:23
**demand (4)** 11:10;15:13;

LEWIS LAKE vs.
HAYT, HAYT & LANDAU, et al.

30(b)(6) DEPOSITION

ROBERT J. OROVITZ
October 4, 2019

30:13;40:7
**depends (2)** 23:8;37:6
**depiction (1)** 10:15
**deponent (2)** 4:19;13:7
**deposition (10)** 4:6,23;8:14;
11:17;13:2;14:5,8;24:2;
28:12;41:21
**description (2)** 40:15,17
**designated (1)** 19:3
**determined (1)** 9:9
**difference (1)** 37:22
**different (5)** 20:4;24:11;
37:13;40:1,21
**difficult (1)** 35:14
**directly (3)** 17:24;18:3;
40:25
**disclaimer (1)** 20:7
**disclose (2)** 20:19;21:23
**disclosed (1)** 20:24
**disclosure (3)** 4:1;21:2;25:7
**disclosures (2)** 20:1;27:10
**discovery (4)** 16:16,24;
35:10,15
**discusses (1)** 40:12
**discussion (1)** 38:22
**dispute (2)** 37:6,16
**disputed (1)** 37:3
**disputing (3)** 36:18,23;37:1
**distinguishment (1)** 20:20
**District (1)** 4:8
**document (1)** 6:13
**documents (3)** 8:7;17:3,13
**done (3)** 23:17,21,23
**Dorsen (5)** 18:6,12;21:9,11,
16
**duces (1)** 14:7
**due (1)** 19:1
**duly (1)** 4:13
**Dunlap (1)** 33:2

**E**

**education (1)** 7:21
**effect (2)** 39:10,14
**efforts (1)** 27:1
**either (2)** 31:6;36:1
**electronic (1)** 32:3
**else (3)** 23:23;26:22;28:21
**Eltman (5)** 4:9;31:11;33:5,
20,22
**email (24)** 9:10;10:2,5,15,
22;12:13;14:18;15:2;16:5,
7,9;18:9,11,25;19:5;20:6,
10,12;21:4,24;22:21;23:12;
25:1;35:18
**emails (5)** 18:20;19:2;20:7;
22:15;23:15
**employee (2)** 22:20;26:3
**employees (3)** 15:19;25:25;
26:14
**employers (1)** 18:2
**enacted (1)** 39:10
**encrypted (1)** 20:11

**encryption (1)** 20:11
**enforce (2)** 22:2;23:18
**entire (1)** 19:16
**entity (1)** 32:6
**error (11)** 14:11,16,17,19;
15:6,8,9,11;24:4;25:18,19
**errors (6)** 24:7,10,11,13,17;
27:23
**estoppel (1)** 37:13
**even (1)** 19:22
**Evidence (1)** 28:7
**exactly (1)** 11:18
**examinations (1)** 26:13
**examined (1)** 4:13
**example (4)** 7:25;13:22;
20:25;26:13
**exchanges (1)** 23:12
**Exhibit (12)** 4:25;5:2,25;6:8,
10;9:24;10:1;16:1,3;27:7;
30:7,8
**exist (1)** 29:21
**expect (1)** 23:11
**expert (1)** 15:4
**expertise (2)** 14:22,25
**explain (2)** 29:1;30:1
**extent (8)** 8:9;9:13;12:18,
23;21:24;24:10,21;25:12

**F**

**facts (1)** 38:19
**factual (2)** 9:17;13:21
**factually (2)** 35:3,5
**failure (2)** 38:4,15
**Fair (4)** 15:14,20;33:13;
41:8
**fairly (1)** 35:14
**false (1)** 39:5
**familiar (5)** 5:20;16:5;27:12
**family (2)** 7:22;8:24
**far (1)** 29:3
**fat (1)** 18:18
**February (1)** 12:11
**Federal (2)** 28:7;41:22
**feel (1)** 17:4
**few (1)** 33:17
**file (19)** 11:19,23;12:16;
13:22;14:12;19:3;25:13;
30:18;31:7;33:15,18;34:12,
20;35:2,15;37:14;38:12;
40:5,6
**filed (7)** 5:24;6:11,12;25:10,
11,20;37:5
**files (15)** 11:21;22:5;23:13,
13;31:11,12,25;32:12;
33:11,16,20,22,23;34:7;
37:9
**filing (5)** 9:8;38:8,10,14,19
**finger (1)** 18:18
**firm (11)** 5:12;6:21;10:18;
12:22;29:4,5,20,21;32:8;
34:15;40:6
**firms (2)** 28:25;29:22

**first (7)** 4:13;9:11;10:16;
16:25;29:25;34:2;39:14
**five (1)** 38:8
**flag (2)** 22:19;23:1
**Florida (9)** 26:20,21,23;
27:2,5;29:10;32:9;41:11,12
**follow (3)** 18:15;22:8;24:5
**followed (3)** 11:13;18:19;
26:4
**following (1)** 15:24
**follows (1)** 4:14
**form (23)** 6:23;7:3,7,14,23;
8:25;10:11;12:14;14:13;
16:12,18;17:5;18:13;19:17;
21:10,17;22:22;24:16,20;
36:19;37:10,11;38:2
**forms (3)** 37:18;38:19,23
**formulaic (1)** 37:24
**four-minute (1)** 30:3
**fraud (1)** 37:9
**frequently (1)** 15:17
**friendly (1)** 38:22
**front (1)** 13:24

**G**

**Gardner (1)** 33:2
**garnered (1)** 34:21
**gave (1)** 13:21;22:13
**gearing (1)** 22:25
**general (1)** 8:13
**generally (6)** 18:21;19:10;
26:14,15;37:25;40:22
**generated (1)** 11:10
**genesis (1)** 29:16
**Georgia (10)** 4:4,8;27:1,5;
32:9;33:1,3,8;41:11,13
**germane (3)** 19:6;25:15;
40:16
**gets (1)** 35:24
**given (3)** 4:22;29:8;33:16
**guess (7)** 12:12;25:21,23;
29:2;30:23;35:7;39:24
**guessing (1)** 35:6

**H**

**hand (1)** 5:1
**handful (2)** 34:7,8
**happened (3)** 18:19;31:15;
32:2
**happening (1)** 30:1
**Hayt (66)** 4:6,6,9,9,20,20;
5:9,9;9:8,9,12,12,17,17;
10:4,4,6,6,17,17,25,25;11:2,
2;17:16,16,19,19;18:4,4,16,
16;19:25,25;27:10,10,14,
14;28:10,11,15,15,19,19,22,
23;29:4,4,9,9,11,11,12,13,
13,13,18,18;30:17,17;
32:25,25;33:3,3;34:11,11
**heart (2)** 16:11,14
**here's (1)** 37:22

**HH&L (7)** 27:4;34:22,23;
36:17,23;39:1,4
**HHL (9)** 11:11;17:21,22;
24:7;26:22;32:6;40:22,24;
41:6
**HHL's (2)** 17:24;40:25
**hired (5)** 12:9;31:24;32:7,
16;33:6
**hiring (1)** 32:25
**hit (1)** 35:24
**hits (1)** 33:15
**hope (2)** 27:16,24
**huge (1)** 22:7
**hundred (1)** 33:17

**I**

**idea (2)** 7:15;8:6
**identifying (1)** 24:11
**IDL (1)** 40:15
**ignore (1)** 20:15
**imagine (3)** 30:24;33:15;
34:6
**importance (1)** 15:23
**impression (1)** 25:17
**Inc (1)** 29:18
**include (1)** 10:22;18:9
**included (1)** 31:17
**including (1)** 18:1
**incorrect (1)** 34:17
**independent (1)** 6:7
**individual (1)** 21:20
**information (9)** 9:15,17;
11:9,24;12:19;20:14,17,18,
19,21;21:5,23
**initial (9)** 11:10;14:23;
15:12,13;22:17;27:10;
30:13;39:23;40:7
**Initially (2)** 29:10;31:2
**instance (3)** 25:4;26:3,4
**instances (2)** 24:4,12
**instruct (4)** 8:12;9:16;12:22;
35:2
**insurance (2)** 27:14;28:6
**intended (1)** 20:8
**into (2)** 39:10,14
**involved (2)** 5:14;33:19
**involvement (1)** 40:16
**involving (1)** 39:23
**irrelevant (1)** 20:22
**issue (3)** 38:3,18,21
**items (1)** 8:2

**J**

**Jersey (1)** 28:20
**job (1)** 33:6
**jobs (1)** 34:3
**judge (1)** 15:4
**judgment (6)** 11:7,8,9,25;
12:17;13:22
**Judicial (1)** 4:3
**June (6)** 25:10,10,11;30:16;

LEWIS LAKE vs.
HAYT, HAYT & LANDAU, et al.

30(b)(6) DEPOSITION

ROBERT J. OROVITZ
October 4, 2019

34:9;39:1

## K

**keep (4)** 19:4;26:10;30:17, 20
**kept (1)** 36:23
**key (1)** 20:11
**kind (3)** 22:13;29:1;35:6
**kindness (1)** 16:10
**knew (2)** 25:3;35:7
**knowledge (6)** 8:13;9:1; 13:15;28:4;41:9,14
**KOHLMYER (28)** 6:23;7:3, 7,14,23;8:9,25;9:13;10:11; 12:14,18;14:13;16:12,18; 17:5;18:13;19:17;21:10,17, 19;22:22;23:4;24:16,20; 32:21;34:25;36:19;41:19

## L

**Lake (14)** 4:8;6:22;8:4,6; 9:11;10:6,16,17;18:5;21:9, 16;35:12;36:18,22
**Lake's (2)** 34:12,23
**Landau (30)** 4:6,9,20;5:10; 9:9,12,18;10:4,7,17;11:2; 17:19;18:4,16;19:25;27:14; 28:11,15,19,23;29:4,10,11, 13,14,18;30:17;33:1,3; 34:12
**Landau's (3)** 10:25;17:17; 27:10
**larger (1)** 29:20
**last (2)** 39:16;40:14
**lasted (1)** 29:11
**Laurens (1)** 16:16
**Law (17)** 4:9;5:12;10:18; 24:14,18,22;28:24;29:3,5,9, 20,21,22;31:11;32:8;34:15; 40:6
**lawsuit (6)** 5:20;16:16;25:5; 31:1;34:20;37:4
**lawyer (1)** 37:5
**lawyers (3)** 33:8;37:3;38:24
**lazy (1)** 38:24
**learn (1)** 26:3
**learned (1)** 31:1
**least (2)** 15:18;26:25
**legal (1)** 15:8
**less (1)** 31:23
**letter (22)** 11:10;14:21,24; 15:13;17:20;25:14;30:13; 34:10,14,24;35:16,23,25; 36:7,10,14,16,16,17;39:1; 40:7,11
**letterhead (1)** 10:19
**letters (6)** 17:21;18:8;22:6; 40:12,19,23
**Lewis (3)** 4:8;10:6,16
**liability (1)** 4:7
**limitations (1)** 37:13

**limited (1)** 4:7
**list (1)** 39:15
**listen (1)** 22:6
**litigation (3)** 11:21;12:21; 17:11
**little (2)** 31:3;32:17
**loan (5)** 7:10,12,17;8:1,22
**loans (1)** 7:20
**log (3)** 26:10;30:17;36:4
**long (4)** 22:13;28:18;29:3; 32:21
**longer (2)** 19:5;33:6
**look (6)** 9:25;22:5,6;33:16, 17;37:21
**looking (2)** 21:4;35:2
**lot (2)** 34:7;37:20

## M

**Mae (1)** 31:6
**maintain (1)** 14:11
**maintaining (1)** 24:7
**makes (1)** 11:11
**making (1)** 39:5
**man (1)** 35:22
**manager (1)** 19:3
**managing (1)** 28:1
**many (2)** 33:16;38:11
**marked (14)** 4:25;5:2,25; 6:1,8,10;9:24;10:1;12:17; 16:1,3;27:7;9;30:8
**materials (1)** 8:10
**matters (2)** 22:5;26:12
**may (8)** 6:5,5;12:11,23; 25:14;33:24;35:3;37:23
**maybe (1)** 9:22
**mean (1)** 19:18
**meaningful (1)** 40:16
**meant (2)** 25:23,24
**memorized (1)** 10:20
**might (1)** 26:14
**mind (3)** 33:14;36:12;38:12
**minute (1)** 6:2
**mismarked (1)** 14:12
**money (2)** 8:2,6
**months (2)** 22:20;23:3
**more (2)** 32:11;34:8
**most (2)** 13:14;23:12
**moved (1)** 13:22
**much (1)** 37:21
**myself (1)** 29:8

## N

**name (2)** 4:17;29:19
**named (2)** 8:5;28:15
**nature (2)** 5:15;37:6
**Navient (6)** 8:12;31:16;32:5, 8;33:10,22
**necessary (3)** 18:25;21:2; 32:24
**need (1)** 32:17
**neighbors (1)** 18:1

**new (4)** 16:25;28:20,20; 29:5
**nice (1)** 35:22
**non-confidential (1)** 20:18
**None (1)** 37:19
**non-judgment (1)** 13:23
**non-tuition-related (1)** 8:2
**Northern (1)** 4:8
**notate (4)** 36:8;37:2,8,9
**note (3)** 7:4;37:4,8
**notice (7)** 4:11,23;10:23; 14:5,9,24;36:15
**notices (2)** 11:1;28:12
**November (1)** 39:17
**number (1)** 8:2;22:9

## O

**Object (20)** 6:23;7:3,7,14, 23;8:25;10:11;12:14;14:13; 16:12,18;17:5;18:13;19:17; 21:10,17;22:22;24:16,20; 36:19
**objection (1)** 23:4
**occurred (6)** 8:3;14:11;15:6; 24:8,18;25:9
**occurs (2)** 26:2,8
**OCGA (1)** 41:23
**October (9)** 9:10;10:2;12:4; 14:18;25:1,14;40:8
**offensive (1)** 17:12
**office (14)** 11:24;14:6;19:1; 22:1,25;26:19,20;29:9;31:8, 10;32:9;33:9,15,24
**offices (4)** 26:22;28:19,20; 29:17
**omissions (1)** 27:23
**one (24)** 9:1;13:9;20:2,3,9; 23:18;27:9;30:10,14,23; 31:2;34:1,2;39:11,23;40:2, 3,4,7,10,11,21;41:14,15
**only (6)** 6:5;14:15;20:13; 21:5;24:3;30:15
**open (1)** 29:9
**opening (1)** 32:9
**operations (1)** 5:14
**opinion (2)** 38:6,13
**opportunity (1)** 29:9
**order (2)** 19:1,4
**ordering (1)** 41:20
**original (2)** 38:5,16
**OROVITZ (3)** 4:12,18;29:12
**otherwise (1)** 35:11
**out (10)** 7:12,17,20;16:10; 18:20;25:14;28:14;29:4; 30:21,23,24;31:2;33:4,14; 34:24;35:24,25;37:11;40:6
**outside (1)** 19:1
**over (7)** 17:3;29:20;31:25; 32:1;37:15,15,15
**overlap (1)** 33:7
**owner (1)** 5:9

## P

**P-1 (1)** 5:2
**P-2 (1)** 6:1
**P-3 (1)** 6:10
**P-4 (1)** 10:1
**P-5 (1)** 16:3
**P-6 (1)** 27:9
**P-7 (1)** 30:7
**PA (1)** 29:12
**Page (4)** 6:18;18;9:4,5
**Paragraph (5)** 6:15,19;9:6, 10;40:17
**part (4)** 15:22;17:20;19:6; 22:7
**particular (10)** 8:21;9:21; 11:4;13:15,25;20:4,9;21:3; 33:21;34:16
**parties (5)** 17:18,22;18:1; 40:13,23
**partner (1)** 28:1
**PC (1)** 4:10
**pending (2)** 12:21;16:16
**Pennsylvania (1)** 28:21
**people (6)** 7:20;22:4,15; 24:3;37:17;38:18
**per (1)** 11:22
**percent (2)** 5:9;27:19
**perhaps (1)** 38:4
**period (1)** 33:7
**permission (1)** 17:23;40:24
**person (11)** 8:1;11:16; 12:25;13:1,14,22;16;23:8; 26:16;31:21;37:6,8
**personal (4)** 8:24;13:14; 38:6,13
**personally (4)** 27:20;34:15, 23;38:3
**perspective (1)** 37:25
**phone (1)** 22:6
**physical (2)** 31:12;33:8
**picked (2)** 25:21;31:10
**PL (4)** 4:6,9;5:10;29:14
**place (1)** 12:3
**placed (6)** 11:7,9,20;31:7; 32:1;33:18
**plaintiff (1)** 38:5
**Plaintiffs (1)** 38:23
**Plaintiff's (13)** 4:25;5:2,25; 6:8,10;9:24;10:1;16:1,3; 27:7;30:7,8;37:25
**please (1)** 10:3
**point (4)** 17:10;23:14;33:18; 39:25
**policies (6)** 10:25;11:22; 15:23;22:3;40:1,21
**policy (37)** 11:3;12:2,5; 14:22;15:5,9;17:17,20,21, 24;18:8,16,20,22;19:7,10, 13,16,25;20:16;21:23,25; 22:8,10,17;23:19;24:24; 26:4;27:15;28:5;39:4,8,22;

LEWIS LAKE vs.
HAYT, HAYT & LANDAU, et al.

30(b)(6) DEPOSITION

ROBERT J. OROVITZ
October 4, 2019

40:11,19,22;41:1
**portion (1)** 11:4
**position (1)** 13:19
**post (1)** 12:17
**post-judgment (4)** 11:5,6,20; 28:11
**potentially (1)** 31:17
**Practices (3)** 15:15,20;41:8
**preparation (1)** 8:13
**prepared (2)** 5:3;24:22
**presented (1)** 38:20
**pretty (2)** 30:25;37:21
**previous (1)** 11:11
**Prior (7)** 4:22;10:5,10; 12:13;32:9,25;34:23
**privilege (3)** 8:11;12:20; 35:1
**privileged (1)** 9:14
**pro (1)** 23:14
**probably (4)** 6:16;31:20; 33:11;39:3
**problem (9)** 19:13,16,20,21, 23;35:9;37:17;38:7,10
**procedure (19)** 11:3,13; 12:2,6;14:23;15:5,10; 17:17;18:20,22;20:1,16; 22:9;28:8;39:4,9,22;40:12; 41:23
**procedures (6)** 11:1,22; 15:23;17:20;22:3;40:2
**process (1)** 11:23;23:7;34:1
**product (3)** 9:15;12:20;35:1
**professional (1)** 4:7
**proffer (1)** 6:11
**Promissory (1)** 7:4
**prompting (1)** 11:25
**protected (1)** 12:22
**provide (1)** 23:19
**provided (5)** 8:8;25:1,7; 26:16;28:6
**providing (1)** 17:13
**public (2)** 20:25;21:6
**pull (1)** 20:15
**pulled (1)** 37:11
**purpose (7)** 7:5,8,11;8:19, 21;16:7,8
**purposes (1)** 8:24
**pursuant (2)** 4:1,11;41:22
**put (2)** 12:2;39:10

## R

**raised (1)** 38:4
**raises (2)** 37:10;38:1
**read (2)** 40:17;41:19
**reading (2)** 11:2;17:19
**really (8)** 6:6;13:16;15:4; 32:11;35:6;38:18,19;40:21
**reason (3)** 7:21;8:23;10:21
**recall (2)** 28:19;31:10
**re-call (2)** 21:2,3
**received (3)** 11:24;25:15; 33:10

**receives (2)** 17:22;40:24
**Recess (1)** 30:5
**recollection (1)** 6:7
**record (6)** 21:1,6;22:18; 26:13;30:6;36:23
**red (2)** 22:19;23:1
**reference (2)** 11:11;20:14
**referenced (1)** 9:10
**referring (1)** 9:21
**refill (1)** 30:2
**regard (1)** 14:18
**regarding (8)** 9:11;10:6,16; 11:1;17:17;38:22;39:9; 40:19
**regards (2)** 12:21;35:2
**Regulations (1)** 4:2
**relationship (1)** 29:21
**relevant (1)** 38:16
**rely (1)** 14:20
**remedial (8)** 23:19,21;25:7, 12,17;26:1,2,16
**remediation (4)** 22:10; 23:17;25:2,22
**remedy (2)** 25:18;26:5
**remember (2)** 6:6;31:24
**rep (2)** 21:20,21
**replacing (1)** 11:11
**Reporter (1)** 4:1
**Reporting (1)** 4:3
**representative (1)** 9:18
**representing (1)** 41:7
**request (1)** 19:2
**requests (1)** 35:10
**required (3)** 15:2;28:7;40:5
**requires (1)** 13:23
**reserved (1)** 41:24
**respect (2)** 24:25;25:6
**respond (3)** 12:1;16:15; 35:15
**responding (2)** 16:24;35:10
**response (2)** 17:8;37:4
**responsive (1)** 32:21
**resulted (1)** 24:18
**retrained (1)** 22:10
**revelation (1)** 12:19
**review (6)** 6:3;11:23;34:4; 35:23;39:16;40:6
**reviewed (11)** 8:7;11:8,24; 34:12,16,18,19,23;35:12; 39:20,24
**reviewing (2)** 34:1;35:15
**reviews (2)** 36:7;39:15
**rewind (1)** 31:3
**right (4)** 22:11;27:9;31:21; 38:17
**ROBERT (3)** 4:12,18;29:12
**Ronald (1)** 35:21
**Rule (1)** 41:22
**Rules (3)** 4:2;28:7;41:23
**running (1)** 33:9

## S

**Sallie (1)** 31:6
**salutation (1)** 35:20
**Same (5)** 23:4;25:8;37:14, 21,25
**saying (5)** 24:9,10;25:16,16; 38:15
**se (1)** 23:14
**section (1)** 41:4
**seem (2)** 22:11;23:13
**seems (1)** 10:18
**send (4)** 17:21;18:20;40:6, 23
**sending (5)** 11:1;21:24; 22:17;28:11;40:12
**sent (18)** 12:13;16:10,15; 18:11,18;19:2;20:11;25:14; 30:14,21,23,24;31:2;34:24; 35:18,24;36:17;39:2
**separate (1)** 20:12
**served (2)** 25:4;30:25
**set (1)** 11:25
**shareholder (1)** 27:19
**show (2)** 10:1;27:8
**showed (1)** 8:22
**showing (2)** 6:9;16:2
**side (3)** 6:17,17;17:13
**sign (1)** 37:7
**signature (1)** 41:24
**significant (4)** 21:8,15,18,25
**simply (1)** 14:12
**single (1)** 22:21
**situation (3)** 11:19;28:10; 37:24
**six (1)** 23:2
**somebody (8)** 14:8;22:8,19; 23:23;36:7,25;38:8,14
**sometime (1)** 12:10
**sometimes (1)** 38:24
**somewhere (1)** 36:24
**Soon (1)** 5:24
**sorry (1)** 21:14
**sort (5)** 10:9;22:25;23:21; 27:23;36:4
**speak (2)** 13:12;17:11
**speaking (3)** 13:9;16:24; 29:8
**specific (4)** 25:18,19;26:3,4
**speculation (1)** 19:19
**spits (1)** 35:25
**spouses (1)** 18:1
**stages (1)** 11:21
**start (5)** 5:6;6:15,17;22:14; 29:19
**state (1)** 4:17
**statements (1)** 39:5
**states (3)** 27:1,4;29:16
**status (1)** 11:9
**statute (1)** 37:12
**steps (2)** 21:1;22:9
**Stern (3)** 24:1;26:17;28:2
**stick (1)** 33:14
**still (1)** 33:7
**stories (2)** 29:15;32:20

**story (1)** 32:18
**student (7)** 7:10,20;8:1,22
**style (1)** 21:6
**subject (3)** 8:11;34:25
**subpoena (1)** 14:6
**Substitution (1)** 11:3;39:24; 40:4,8
**sued (6)** 21:9,16;27:4; 28:11;41:7,13
**suggesting (2)** 24:13,14
**suit (1)** 25:20
**Superior (1)** 16:17
**super-secret (1)** 31:5
**supervised (1)** 26:1
**supervision (2)** 26:2,7
**supposed (1)** 35:8
**sure (4)** 6:3;11:18;15:6; 23:6
**sworn (1)** 4:13
**system (2)** 22:17,21

## T

**talk (3)** 9:5;18:23;25:17
**talked (4)** 39:23;40:1,2,3
**talking (7)** 6:4;25:18;28:4; 34:6;35:6;39:11;41:15
**tecum (1)** 14:7
**tells (1)** 31:5
**terms (1)** 23:17
**testified (1)** 4:14
**testify (1)** 5:3
**testimony (1)** 24:6
**theoretically (1)** 16:23
**thinking (1)** 7:19
**third (5)** 17:18,22;18:1; 40:13,23
**third-party (3)** 20:1;25:6; 39:9
**though (3)** 8:7;10:12;23:13
**thought (1)** 28:18
**thoughts (2)** 7:18;8:5
**three (3)** 22:20;29:19;40:1
**thus (1)** 11:25
**title (1)** 6:6
**titled (4)** 11:3;39:12;40:7,11
**titles (1)** 5:17
**today (6)** 4:22;5:4,21;6:24; 8:14;13:5
**took (4)** 11:17;13:2;24:2; 29:20
**topics (2)** 4:23;5:3
**track (3)** 6:17;19:4;30:20
**trained (7)** 12:5,8;19:7; 25:20,25;26:10;33:9
**training (12)** 15:14,19; 23:19,21;25:2,7,13,15;26:2, 7,8,17
**truck (2)** 31:14;32:3
**true (2)** 10:14;36:20
**try (1)** 25:23
**trying (2)** 6:21;31:4
**turn (1)** 17:3

LEWIS LAKE vs.
HAYT, HAYT & LANDAU, et al.

30(b)(6) DEPOSITION

ROBERT J. OROVITZ
October 4, 2019

**two (9)** 11:17;13:2;19:20;
24:2,3,7,11;33:1;40:21
**type (2)** 8:17;26:6
**typically (1)** 20:6

## U

**undergoing (1)** 25:13
**unless (2)** 17:22;40:24
**unusual (1)** 11:19
**up (4)** 22:25;25:21;31:10;
33:9
**Updated (1)** 40:15
**USC (1)** 10:22
**use (4)** 37:19;38:23,23,24
**used (1)** 8:1
**user (1)** 20:8
**using (3)** 29:19;33:1;37:17

## V

**verbal (3)** 17:23;20:5;40:24
**verbally (2)** 17:25;41:1
**verbiage (1)** 20:8
**versus (2)** 4:9;20:17
**via (2)** 18:25;20:11
**violated (1)** 24:14
**violates (1)** 21:25
**violation (4)** 21:22;24:18,22;
41:8
**violations (1)** 24:24

## W

**waiver (1)** 37:13
**way (4)** 9:1;19:18;36:1;37:1
**weeks (3)** 11:17;13:2;24:2
**Wes (2)** 33:2,7
**what's (3)** 6:9,17;10:1
**whatsoever (2)** 37:19;38:3
**whole (1)** 20:20
**whose (3)** 11:17;13:2;24:1
**without (2)** 18:2;35:15
**witness (28)** 5:7;6:24;7:4,8,
15,24;8:15;9:1,20;10:13;
12:15,25;14:15;16:13,19;
17:7;18:15;19:18;21:11,18,
22;22:24;23:6;24:21;32:23;
35:5;36:20;41:24
**word (1)** 25:21
**words (1)** 29:19
**work (5)** 5:11;6:16;9:14;
12:20;35:1
**worked (2)** 33:23,24
**working (1)** 33:4
**writes (1)** 36:25
**written (2)** 17:23;40:24
**wrong (8)** 18:17,18;20:10,
12,13;21:5,11,24

## Y

**y'all (2)** 30:4;31:16

**year (5)** 19:16;25:11;29:11,
25;33:16
**York (2)** 28:20;29:5

## 1

**1 (1)** 4:25
**1:19-CV-02457 (1)** 4:10
**10:50 am (1)** 30:5
**10:52 am (1)** 30:5
**10B (1)** 4:2
**11:16 am (1)** 41:21
**11th (3)** 30:16;34:9;39:1
**13th (2)** 25:10;39:17
**14th (1)** 25:10
**15 (1)** 10:22
**16 (1)** 6:19
**1692g (2)** 10:22;11:1
**1987 (2)** 29:5,20

## 2

**2 (1)** 5:25
**20 (3)** 5:9;27:19;37:13
**2009 (1)** 29:13
**2012 (2)** 39:14;40:14
**2013 (2)** 12:4;40:9
**2017 (1)** 40:15
**2018 (6)** 9:10;10:2;12:9,11;
14:18;39:17
**2019 (2)** 30:16;34:9
**26 (2)** 9:6,10
**29 (1)** 38:2

## 3

**3 (3)** 6:8,18,18
**30 (3)** 37:10;38:1,2
**30b6 (4)** 4:5,19;5:7;13:7
**30-day (1)** 14:24
**30e (1)** 41:22
**364 (1)** 19:22

## 4

**4 (3)** 9:4,5,24

## 5

**5 (1)** 16:1
**5th (4)** 9:10;10:2;14:18;
25:1

## 6

**6 (1)** 27:7

## 7

**7 (1)** 30:8

## 9

**9-11-30e (1)** 41:23